UNITED STATES, Appellee

v.

JOHN ROMAN, Private, U. S. Army, Appellant

1 USCMA 244, 2 CMR 150

245

No. 191

Decided March 19, 1952

1ST LT. Thomas E. Cole, USA, for Appellant.
LT. COL. Paul J. Leahy, USA, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case is before us on petition by the accused to review the record of his conviction for the offense of unpremeditated murder. He was sentenced to a dishonorable discharge, total forfeitures, and confinement for fifteen years. The convening authority approved the finding and sentence, and the board of review in the office of The Judge Advocate General of the Army affirmed. In granting the petition we limited our review to a determination of the sufficiency of the evidence to establish the death of the person named in the specification; and the accuracy and sufficiency of the instructions given by the law officer.

The events out of which the charge arose occurred at about 7:30 P.M. on March 24, 1951, in the town hall at Iri, Korea, where several members of the Korean militia were congregated. Petitioner entered the hall in an intoxicated condition, carrying an M–1 rifle. Some few minutes after he entered he fired a shot into the ceiling. About two minutes after this he covered the squad leader near the door of the room and fired a second shot. When this shot was fired, the leader fell to the floor critical-

246

ly injured and petitioner immediately left. Witnesses observed a bullet wound in the head of the victim, the point of entry being through the right eye and the point of exit by his left ear. He was taken to the hospital, unconscious and vomiting and bleeding profusely. At about 4:00 A.M. the following day a Korean who was suffering from an identical wound died.

We first dispose of the contention that the identity of the person who died was not established beyond a reasonable doubt. The evidence is clear that the man who was shot in the town hall on the evening of March 24, 1951, was named Pak, Sa Nam, the name charged in the specification. All of the witnesses who testified regarding the shooting identified the victim by that name. The only question, therefore, is whether he was the same person who subsequently died. The confusion, if any, in this regard is brought about by some of the testimony of an assistant doctor, who stated that he had examined a Korean who was brought to the hospital at about 8:00 P.M. on March 24, 1951; that he was suffering from a bullet wound; that the bullet had entered through his right eye and left at a point by his left ear; and that the Korean had subsequently died. The doctor testifying referred to the victim as Pak, Sa Nam and at one point in his testimony stated that he named Pak, Sa Nam in the death certificate. However, in response to a request by one of the members of the court to spell the name of the man who died, he spelled it as "Pac Sel Lam"; but, on further direct examination, stated that the person Pak, Sa Nam had died on March 25, 1951. One of the witnesses who was present at the time of the shooting identified the assistant doctor as being present at the hospital when the witness took Pak, Sa Nam there after he was shot. The record also contains the testimony of another doctor who treated the victim. His description of the wounds was the same as that of the assistant doctor. He testified without objection or qualification that Pak, Sa Nam died of the injuries caused by a bullet which entered his right eye and exited by his left ear. He saw the patient again after death, and stated that the cause of death was the penetration of the bullet.

The related evidence is ample to justify the court in finding that Pak, Sa Nam was the individual killed. The misspelling of the name by one witness, which may be explained by the difference in language and the difficulties encountered in testifying through an interpreter, is the only evidence or circumstance from which it might be inferred that the witnesses were not talking about the same person. The wounds described by those treating the Korean at the hospital were identical and corresponded with the description of the wounds received by the victim of the town hall shooting. The sequence of events in point of time, the locale where they happened, the identity of the physical injury, and the description of the victim's condition to the effect that he was vomiting extensively, bleeding profusely and unconscious at the time he was taken to the hospital, which corresponds with the condition of the person when he was first treated by the doctors, are all consistent with the finding that the person shot by petitioner was the same person whom the doctors treated, and who died the following day.

The next contention asserted by petitioner requires a treatment of the adequacy and completeness of the instructions. Petitioner was charged with, and found guilty of, unpremeditated murder in violation of Article of War 92, 10 USC § 1564. The specification upon which he was tried is as follows:

"In that Private John Roman, . . . did, at Iri, Korea, on or about 24 March 1951, with malice aforethought, willfully, feloniously, and unlawfully kill, Pak, Sa Nam, a human being, by shooting him with a rifle."

The law officer, in instructing the members of the court-martial on the elements of the offense, stated as follows:

"The court is advised that the elements of the offense are as follows:
. . .
" '(a) That the accused unlawfully

killed a certain person named or described by certain means, as alleged (requiring proof that the alleged victim is dead, that his death resulted from an injury received by him, that such injury resulted from an act of the accused, and that the death occurred within a year and a day of such act); and

" '(b) That such killing was with malice aforethought.' "

In discussing malice, the law officer read the following from the Manual. (Portions considered irrelevant are deleted).

"Malice aforethought may exist when the act is unpremeditated. It may mean any one or more of the following states of mind preceding or coexisting with the act or omission by which death is caused: An intention to cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not; knowledge that the act which causes death will probably cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not, even though such knowledge be accompanied by indifference whether death or great bodily harm is caused, or by a wish that it may not be caused; intent to commit any felony; . . ."

The petitioner contends that the foregoing instructions do not include all the elements of unpremeditated murder. We overrule this contention. While we do not commend the reading of an extended discussion from the Manual, particularly when some of the statements are inapplicable, we are required to look at the charge as a whole and determine whether the court was clearly, fully, and fairly instructed. If the elements of the offense charged in this instance and included within the statement of the law officer are marshalled together they properly define the offense. In order to find the accused guilty under the instruction as given the court was required to find beyond a reasonable doubt that Pak, Sa Nam was dead, and that

248

his death occurred within one year from the date of his injury; that the death resulted from an injury received by him; that the injury resulting in death was unlawfully caused by petitioner shooting Pak, Sa Nam with an M–1 rifle; and that the killing was with malice aforethought. The malice aforethought, as applied to the state of mind of petitioner, was given as the intent to cause the death of, or the intent to cause grievous bodily harm to, Pak, Sa Nam. We believe these elements are all included within the charge and are those required for murder, with the exception of premeditation. Under military law, this is an element of the most serious offense. However, it was not alleged in the case, was not an issue, and so there was no necessity for including it as an element in the instructions.

Petitioner next contends that the law officer erred when he failed to instruct on any of the lesser included offenses. This contention can be broken down into two parts: first, that the evidence of intoxication required an instruction on manslaughter; and second, that instructions should have been given defining the included crimes of (a) voluntary manslaughter, (b) involuntary manslaughter, and (c) negligent homicide.

Some of the government witnesses testified that petitioner was drunk at the time of the shooting, and this is in part corroborated by petitioner's pretrial statement. While the evidence was far from being conclusive, we shall, for this part of our discussion, assume his mental capacity was affected by his drinking so as to raise a doubt about his being able to deliberate and form an intent to kill.

There appears to be some uncertainty arising out of murder cases when the killing has been done while the killer was under the influence of intoxicating liquor. As a general rule, it may be stated that drunkenness is no excuse for the commission of a crime, but it may reduce the degree of the crime or negate a specific intent. This rule is made applicable to Army personnel by Section 140a, Manual for Courts-Martial, U. S. Army, 1949, which provides:

"It is a general rule of law that voluntary drunkenness, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; but it may be considered as affecting mental capacity to entertain a specific intent or state of mind, when a particular intent or state of mind is a necessary element of the offense."

Colonel Winthrop, in his Military Law and Precedents, Second Edition, Reprint 1920, in discussing cases involving a distinct intent or deliberation or premeditation, states the early military rule on pages 292–293:

"In such cases evidence of the drunken condition of the party at the time of his commission of the alleged crime is held admissible, not to excuse or extenuate the act as such, but to aid in determining whether, in view of the state of his mind, such act amounted to the specific crime charged, or which of two or more crimes, similar but distinguished in degree, it really was in law. . . . So, upon an indictment for murder, testimony as to the inebriation of the accused at the time of the killing may ordinarily properly be admitted as indicating a mental excitement, confusion, or unconsciousness, incompatible under the circumstances of the case with premeditation or a deliberate intent to take life, and as reducing the crime to the grade of manslaughter, or—where such an offence is created by the State statute—of murder in the second (or other) degree."

In order to catalogue the quotations from decided cases and text writers, we must take into account differences between the degrees of homicide and the statutory law at the time the statement was made. At common law, there were no degrees of murder, the homicide offenses being graded as either murder or manslaughter. This may account for the statement in Winthrop, supra, that intoxication may reduce the crime to manslaughter or to second degree murder where such a degree of offense has been enacted. At the present time, by statute, in most civilian jurisdictions, murders are usually classified as first or second degree, and the elements of each are set forth. A counterpart of these degrees in military law is premeditated and unpremeditated murder. Generally speaking, premeditated murder in the military equals first degree murder in the civilian, and premeditation and intent to kill are essential elements of that degree. Not so in second degree and unpremeditated murder. Specific intent or premeditation are not ingredients of that offense. The difference, in so far as the military is concerned, can be emphasized by quoting from the Manual for Courts-Martial, U. S. Army, 1949. Paragraph 179a, page 231, states the principle with respect to the difference:

"Murder does not require premeditation, but if premeditated it is a more serious offense and may be punished by death. A murder is not premeditated, unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intention to kill someone and consideration of the act intended. Premeditation imports substantial, although brief, deliberation or design."

Article of War 92, supra, which is the foundation for the discussion, points up the two different gradations in the following language:

"Any person subject to military law found guilty of murder shall suffer death or imprisonment for life, as a court-martial may direct; but if found guilty of murder not premeditated, he shall be punished as a court-martial may direct."

In further developing this subject we believe it might be helpful to compare the military murder offenses with those of the District of Columbia and then quote from two cases which have considered the effect of intoxication on murder as defined in the law of the District. Section 22–2401, District of Columbia Code, defines murder in the first degree as follows:

"Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–501 or 22–402 of this Code, rape, mayhem, robbery, or kidnapping, or in perpetrating or in attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree."

Section 22–2403, District of Columbia Code, states murder in the second degree to be as follows:

"Whoever with malice aforethought, except as provided in sections 22–2401, 22–2402, kills another, is guilty of murder in the second degree."

From a reading of these two sections it would appear that first degree murder, according to the District of Columbia law, requires deliberate and premeditated malice, while second degree murder prescribes only for malice aforethought, the distinguishing element being the premeditation. It is apparent these degrees closely parallel the military gradations of the offense.

The United States Court of Appeals for the District of Columbia, in the case of Bishop v. United States, 107 F2d 297, had before it the particular question which now concerns us. In view of the excellent treatment of the subject we quote at some length from that case: (pp 301–302)

"Under the District of Columbia statute, a homicide committed purposely and with deliberate and premeditated malice is murder in the first degree. A homicide committed with malice aforethought, without deliberation and premeditation, is murder in the second degree. . . .

"Intoxication at common law was no defense to the crime of murder. It could neither justify an acquittal, nor reduce common law murder to manslaughter. From an early day to this hour, the law has declared that intoxication is not an excuse for the commission of a crime. While it has long been recognized that intoxication per se is no defense to the fact of guilt, the stated condition of a defendant's mind at the time of the killing in respect of its ability to form the intent to kill, or if formed to deliberate and premeditate thereupon, is now a proper subject for consideration, inquiry and determination by the jury. Thus, voluntary intoxication will not excuse murder, but it may negative the ability of the defendant to form the specific intent to kill, or the deliberation and premeditation necessary to constitute first degree murder, in which event there is a reduction to second degree murder.

". . . However, appellant maintains that the defense of voluntary intoxication goes further than the reduction from first degree murder to murder in the second degree, and that the defendant's voluntary intoxication negatived the malice aforethought required to constitute second degree murder under our statute, thereby reducing second degree murder to voluntary manslaughter, or—as is evidenced by the prayer under discussion—warranting an acquittal. His contention is met in clear pronouncements from early authorities to the present day. Voluntary intoxication may not reduce murder to voluntary manslaughter, nor permit an acquittal of murder."

That this has long been the general rule in the federal courts can be gathered from the principles announced in the early case of Hopt v. People (1881), 104 US 631, 26 L ed 873. In that case the Supreme Court of the United States said: (pp 633–634)

"At common law, indeed, as a general rule, voluntary intoxication affords no excuse, justification or extenuation of a crime committed under its influence. [Citing cases]. But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute

murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject for consideration by the jury."

In line with the reasoning of the Bishop case, supra, we believe the better rule to be that if an ac- ▉▉▉▉▉ ▉ cused is charged with premeditated murder and there is evidence that he was intoxicated to such an extent that the court-martial could reasonably find that he could not deliberate and premeditate over the intent to kill, that an instruction on the effect of his intoxication should be given. However, following the holding in that case and other authorities we hereinafter refer to, we go no further than to announce a rule which will permit the court-martial to consider whether voluntary intoxication negates premeditation and reduces premeditated murder to unpremeditated murder. We do not conceive drunkenness as a mental condition which will reduce unpremeditated murder to manslaughter. This limitation on the rule was announced in the case of Bishop v. United States, supra, and was reiterated by the same Court of Appeals in the case of Nestlerode v. United States (1941), 122 F2d 56. We quote from that case: (pp 59–60)

"The final ground urged is that the court erred in instructing that drunkenness or temporary insanity caused by the particular debauch should not be held to relieve the defendant from criminal responsibility or reduce the crime from second degree murder to manslaughter. We think this position is not well taken. In the recent case of Bishop v. United States, 71 App DC 132, 135, 107 F2d 297, 301, we stated the circumstances under which voluntary intoxication will reduce the degree of the offense from murder in the first to murder in the second degree, but we said that the defendant's voluntary intoxication would not of itself negative the malice required to constitute second degree murder and thereby reduce second de-gree murder to voluntary manslaughter. This is the correct and generally accepted rule. Here the evidence shows beyond question of doubt that appellant had voluntarily got drunk. His 'temporary insanity,' as described by the psychiatrist who testified for him, meant no more than that his overindulgence in alcoholic liquors had so affected his judgment and intelligence as to cause him to be utterly reckless in doing acts endangering the lives and safety of pedestrians. But the fact that he was so affected, under the circumstances shown to have occurred here, will not reduce the grade of the offense from second degree murder to manslaughter."

The Supreme Court of Arkansas, in the case of Ballentine v. State (1939) 198 Ark 1037, 132 SW2d 384, adopts similar reasoning. In that case the court stated: (p 385)

"Drunkenness is no excuse for the killing. High v. State, 197 Ark 681, 120 SW2d 24. In Byrd v. State, supra, this court used this language [76 Ark 286, 88 SW 975]: 'In this case the fact that the defendant was intoxicated at the time he assaulted Burnsides may have raised in the minds of the jury a reasonable doubt as to whether there was a specific intent to kill, and led them to reduce the crime to murder in the second degree. But no specific intent to kill is necessary to constitute the crime of murder in the second degree under our statute, and the law is that "the intention to drink may fully supply the plea of malice aforethought"; so, if one voluntarily becomes too drunk to know what he is about and then without provocation assaults and beats another to death, he commits murder, the same as if he was sober.' "

We do not contend that the holdings of all courts follow the foregoing concept as our attention has been called to the fact that some jurisdictions have held contrary to the rule herein announced. One of the cases which seems to support a contrary holding is State v. Sprouse (1941) 63 Idaho 166, 118 P2d 378, a case decided by the Supreme

**251**

Court of the State of Idaho. The justices of that court divided three to two on the question of whether intoxication would reduce the offense below the level of second degree murder. The majority held that intoxication could be considered in determining malice and reduced the verdict to guilty of voluntary manslaughter. However, we incline to the belief that the rationale of that case deals more with the heat of passion rather than with ordinary intoxication. We quote the following excerpt from that decision to support our assertion: (p 379)

"The evidence clearly shows that appellant and Allen were, and for a long time prior to the homicide had been, close personal friends; that on the day of the homicide they had drunk intoxicating liquor in sufficient quantities to cause them to fall out and fight over a dispute as to the ownership of a part of a bottle of beer; that appellant, on sudden quarrel and heat of passion, fired the shot which killed his friend, Allen. While his voluntary intoxication is no excuse for his act, it is to be taken into consideration in determining the existence or non-existence, on his part, of malice aforethought which distinguishes murder from voluntary manslaughter."

We conclude that, because the alleged crime was unpremeditated murder, no instruction on intoxication ▌ was required; and we turn now to the issue of whether the law officer erred, under the facts of this case, when he failed to instruct on all lesser included offenses. Prior to concluding his instructions, he stated:

"Among the lesser offenses which may be included in a charge of murder · are voluntary and involuntary manslaughter, attempt to commit murder, and certain forms of assault."

It is the contention of the defense counsel that the law officer committed error when he failed to instruct the members of the court as to the elements of the offenses he named. Cast in this factual background, we take a different

**252**

view. We are of the opinion that if the law officer erred in naming ▌ the included offenses, this was an error beneficial to the accused and not prejudicial. In this connection we quote from Volume 53, American Jurisprudence, Section 798: (pp 591–592)

"Where, under the evidence, the defendant must be either guilty of the crime charged or not guilty of any, the general rule is that the court is not required, and may refuse, to instruct the jury as to included offenses or inferior degrees of the offense charged, and the right to convict thereof. Indeed, it has been declared that the giving of an instruction as to included offenses in such a case is an invitation to the jury to return a compromise verdict, and constitutes an error which, according to some authorities, is ground for reversal of a judgment of conviction of an included offense, although not ground for reversing a judgment of conviction of the higher crime. However, according to other authorities, the error is regarded as being in favor of the defendant, and is not ground for reversal whether he is convicted of the offense charged or of an included crime."

Perhaps some of the best reasoning on why instructing on the included offenses is not necessary when the crime of murder is charged and included offenses are not established is contained in Sparf and Hansen v. United States (1895), 156 US 51, 63, 39 L ed 343, 347, 15 S Ct 273. The Supreme Court of the United States, in reviewing a conviction for murder wherein exceptions were taken for the refusal to give requested instructions, stated as follows: (pp 63–64)

"The court below assumed, and correctly, that section 1035 of the Revised Statutes did not authorize a jury in a criminal case to find the defendant guilty of a less offence than the one charged, unless the evidence justified them in so doing. Congress did not intend to invest juries in criminal cases with power arbitrarily to disregard the evidence and the

principles of law applicable to the case on trial. The only object of that section was to enable the jury, in case the defendant was not shown to be guilty of the particular crime charged, and if the evidence permitted them to do so, to find him guilty of a lesser offence necessarily included in the one charged, or of the offence of attempting to commit the one charged. Upon a careful scrutiny of the evidence, we cannot find any ground whatever upon which the jury could properly have reached the conclusion that the defendant Hansen was only guilty of an offence included in the one charged, or of a mere attempt to commit the offence charged. A verdict of guilty of an offence less than the one charged would have been in flagrant disregard of all the proof, and in violation by the jury of their obligation to render a true verdict. There was an entire absence of evidence upon which to rest a verdict of guilty of manslaughter or of simple assault. A verdict of that kind would have been the exercise by the jury of the power to commute the punishment for an offence actually committed, and thus impose a punishment different from that prescribed by law."

We have previously considered the necessity of fully instructing the members of a court-martial, and ▮▮▮▮▮ have held that an instruction on the included offenses is required if there is a reasonable basis in the evidence from which it can be inferred that the lesser crime was committed. In United States v. Clark (No. 190), 1 USCMA 201, decided February 29, 1952, 2 CMR 107, we stated:

"Included offenses are charged within the principal charge, and it is consistent with the Code and with the federal civilian practice to require that they must be defined in instructions, subject to the well-established rule that there must be some evidence from which a reasonable inference may be drawn that the lesser included offense was in issue."

In that case the court-martial found the accused guilty of an included offense for which no instruction had been given. In the case now before us, the members of the court found the accused guilty of the offense charged and this included a finding on all the elements specified in the instruction. The evidence is sufficient to sustain the finding and so the question posed in this case is whether from the evidence there was any issue as to a lesser included offense. If so, an instruction should have been given, otherwise not.

We can dispose summarily of the necessity for an instruction on voluntary manslaughter. This is defined in the Manual as being a homicide caused by an act likely to result in death, intentionally committed in the heat of passion brought about by provocation. The record is barren of any evidence which slightly suggests any act on the part of the deceased, or anyone in the room, which amounted in law to provocation. No one was armed, no violence was threatened and no invectives were hurled. Accused was uninfluenced by anger, sudden resentment, rage or any other element sufficient to obscure reason; and excuse or justification is not suggested. Under such circumstances, we conclude that an instruction on voluntary manslaughter was not required.

In dealing with the necessity of giving instructions on included offenses it must be borne in mind that the law officer makes the preliminary decision and if there is no testimony to reduce the offense below the degree charged there is no obligation to give any instructions. To do so tends to mislead the court. With this principle in mind we consider the remaining errors, if any, in not instructing on involuntary manslaughter and negligent homicide.

The Manual for Courts-Martial, U. S. Army, 1949, defines involuntary manslaughter in the following language (Paragraph 180a, page 234):

"Involuntary manslaughter is homicide unintentionally caused in the commission of an unlawful act not inherently dangerous to human life, or by culpable negligence in perform-

ing a lawful act or an act required by law."

It should require little discussion to establish that an instruction on this offense was not required. Under the definition quoted there are two arms to this offense: (1) Homicide caused by an unlawful act not inherently dangerous to human life; and (2) homicide caused by culpable negligence in performing a lawful act or act required by law. The second arm clearly has no place in this unfortunate drama, as the shooting of the Korean was neither lawful nor required by law. The first arm need only be tested to determine if the acts of the petitioner were inherently dangerous to human life. A simple recitation of the facts will show they were. He was a member of the 58th Military Police Company, whose duty had been to guard some railroad tracks in the area of Iri. On the evening in question, between seven and eight o'clock, after having consumed some intoxicating liquor, he entered a town hall where several members of the Korean militia were congregated. He was carrying an M–1 rifle, which he knew to be a dangerous weapon. After entering the hall, he spoke a few words in English, but no one spoke to him. There was no one else in the room armed, and no hostile movement of any kind was made by the Koreans. He sat on the edge of the table with the rifle over his knee and fired a shot into the ceiling. Most of the Koreans scattered and a few seconds later he backed the squad leader against the wall, stood up, and was holding the weapon in both hands across his mid-section. The muzzle was pointed toward Pak, Sa Nam when the weapon was fired, and the second shot fatally injured the victim.

The petitioner made a pre-trial statement, which was admitted in evidence, but it is significant to note that he does not state any fact which in any way justifies, excuses, or reduces the degree of the homicide, with the possible exception of his claim to having consumed some intoxicating liquor. He gave a fairly coherent story as to his whereabouts and his experiences during the course of the evening, and the following quote shows his recollection of what transpired in the hall:

"I walked into a place I thought was another place to drink and I don't know if I got anything or not. When I was leaving I fired a shot into the wall. When the shot was fired I saw someone throw their hands in the air and started [sic] to fall. I got scared and left the area and looked for a place to sleep. I finally found a place and went to sleep. I was woke [sic] up by and [sic] M.P. Sgt. who placed me under arrest and took me back to Kunsan."

Considering all the available evidence the facts show a deliberate firing of a loaded rifle at the deceased. The results establish the acts were not only inherently dangerous to his life, they were fatal.

What we have said about the necessity of giving an instruction on involuntary manslaughter applies with greater force and effect to the offense of negligent homicide, proscribed by Article of War 96, 10 USC § 1568. Negligent homicide is considered as the unlawful killing of a person as the result of the failure to use due caution and circumspection in the circumstances. It is a homicide accomplished by simple negligence. Neither the evidence of the government nor the pre-trial statement of the accused, which was the only evidence of his version of the transaction, raises an issue of simple negligence. The facts and circumstances show a firing of the weapon without any claim of accident, inadvertence, misadverture, negligence, or carelessness. Accordingly, there being no evidence upon which any suggestion of negligent homicide could be predicated, it was unnecessary to submit any instructions thereon.

The holding of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.