UNITED STATES, Appellee

v.

CHARLES V. JARVIS, Private First Class,
U. S. Army, Appellant

1 USCMA 368, 3 CMR 102

No. 94

Decided May 6, 1952

Alexander P. Gates, Esq., Washington, D. C., for Appellant.

LT. COL. Thayer Chapman, U. S. Army, and 1ST LT. Eugene L. Grimm, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This cause is before us on petition granted on January 10, 1952, pursuant to the provisions of the Uniform Code of Military Justice, Article 67(b)(3), 50 USC § 654. The accused, Jarvis, was tried in Korea by general court-martial for the unpremeditated murder of one Jong Ku Suop, a Korean national, in violation of Article of War 92, 10 USC § 1564. Following his plea of not guilty, he was found guilty, and sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for life. The convening authority approved and a board of review in the office of The Judge Advocate General, United States Army, has affirmed.

II

The testimony shows that petitioner's unit was in reserve in a noncombat area. On the night of April 10, 1951, the accused, together with two other members of his platoon, Peterson and Patrick, went to a Korean house in the vicinity of their company area in search of a prostitute. The house they visited consisted of two rooms separated from a third by a porch. After reach-

ing the house, the accused casually fired several rifle shots at a bull lying in a pen or stall nearby. In response to their request, a Korean man summoned a Korean woman, who joined the accused and his two companions in a room of the house. The accused engaged in sexual intercourse with the woman, after which he told his friends that he would await them outside and left the room. Peterson then had sexual connection. Patrick followed Peterson, and was in the act of intercourse with her when a shot was heard nearby. On investigation, the accused was seen standing at the door of the adjoining room with a rifle in his hands. Peterson immediately joined him and, looking into the third room of the house, saw on the floor the man who had previously secured the prostitute. He was moaning and "lying sort of on his stomach, holding himself up on his hands." There was blood on his trousers just below the belt line. The accused, who was then standing near the wounded Korean, said, "I am glad I killed the old son-of-bitch." Peterson took the accused's rifle, removed the clip, and returned the weapon. When they left the house the accused gave some evidence of intoxication, reeled slightly, and spoke in a loud voice. En route to the company area the accused said, "I believe I shot an old man." An officer in petitioner's unit testified that he examined the latter's rifle on April 11 and that it had been recently fired.

Dr. Chung Ki Soo, a Korean physician in the employ of the American military forces, examined the dead body of a middle-aged Korean male on April 11. This physician testified that the man had died as the result of a bullet wound, the bullet having entered the victim's back, pierced his bladder, and left the body near the navel. The doctor identified the deceased as Jong Ku Suop, but testified that he was not acquainted with the victim personally, and had gained knowledge of identity from neighbors of the dead man, who were present during the examination, and had stated that he was Jong Ku Suop. Jong Ku Suop had been dead some 9 hours at the time of his examination, the doctor declared. The examination took place in a Korean home in the area of the first platoon of petitioner's company "to which the body had been brought"—apparently not the house in which the shooting took place. On the basis of the doctor's testimony, as well as that of appropriate military personnel, it appears that only two persons were wounded by rifle fire ·in the vicinity of petitioner's company area on April 10, 1951. One of these was an 11-year old Korean boy, who was wounded in the hand, and the other was Jong Ku Suop. There was no combat activity in the area on the night in question.

One Byrne, field supply sergeant of the accused's unit, testified that he made an investigation of a reported shooting in his company area. He observed the body of a Korean man in a house located in the first platoon area, and could see that the man "had been hit in the intestines, as they were hanging out." Sergeant Byrne later accompanied a CID agent to another Korean house removed from the first by a distance of from one-quarter to one-half mile. This house consisted of two rooms separated from a third by a court or porch. In an adjacent stall lay a dying bull on whose body the sergeant discerned bullet wounds. One of the rooms of the second house revealed bloodstains on the floor and walls and "a couple of pieces of a shell" lying on the floor. The accused remained silent throughout the trial.

### III

The principal question in this case has to do with whether the identity between the Korean national, who was shot by the accused, and Jong Ku Suop, the Korean national who died subsequently and was examined post mortem by Dr. Chung Ki Soo, was established beyond a reasonable doubt. We first dispose of the contention that it was not so established. The evidence is clear that petitioner seriously wounded such a person, of at least middle years, in the lower abdomen, by rifle fire, in a three room Korean house located near the area of Company E, 35th Infantry Regiment, on the night of April 10, 1951.

Near this house was a stall containing a bull which was also shot by petitioner near the time of the commission of the other offense. It is also clear that Jong Ku Suop, a middle-aged Korean, died that night in the same narrow geographical area from a lower abdominal gunshot wound. Following report, Jong's body was discovered by Sergeant Byrne on April 11, 1951, and examined medically on the same date, in a Korean house also located near the area of Company E, to which house the body had recently been removed from an unknown nearby place. The structure in which the body was found was situated in the same neighborhood, and less than half a mile from another home, similar in layout and construction to the one in which petitioner had shot a Korean national. In this house someone or some living thing had been injured seriously by rifle fire, and adjacent thereto was found a penned bull dying of gunshot wounds. The entire neighborhood was free from combat activity at the time. In addition, the court-martial was told by persons, whose duty it was to know the facts, that during the period in question only two persons from the vicinity in question were reported to be victims of gunshot injuries. One of these was Jong Ku Suop.

It is familiar learning that the guilt of an accused person may be established through circumstantial evidence. It is also recognized that the jurisdiction of this Court extends only to matters of law. See Uniform Code of Military Justice, Article 67 (d), 50 USC § 654. Our task, therefore, is to determine whether the findings of guilty in the case at bar—including the present branch thereof—are based on some substantial evidence, as that term has been interpreted by us in previous decisions. We entertain no doubt that they are so based under the test applied in such cases as United States v. McCrary (No. 4) 1 USCMA 1, 1 CMR 1, decided November 8, 1951, and United States v. O'Neal, (No 25) 1 USCMA 138, 2 CMR 44, decided February 7, 1952. We are quite unwilling to disturb the findings in the present case. This Court had before it recently a case in many details, as well as in essence, similar to the case at bar. See United States v. Roman, (No. 191) 1 USCMA 244, 2 CMR 150, decided March 19, 1952. Although we are aware that minor factual differences may be significant in the field under scrutiny, we believe a useful purpose will be served by quoting the following language from the Roman case:

"The related evidence is ample to justify the court in finding that Pak, Sa Nam was the individual killed. The misspelling of the name by one witness, which may be explained by the difference in language and the difficulties encountered in testifying through an interpreter, is the only evidence or circumstance from which it might be inferred that the witnesses were not talking about the same person. The wounds described by those treating the Korean at the hospital were identical and corresponded with the description of the wounds received by the victim of the town hall shooting. The sequence of events in point of time, the locale where they happened, the identity of the physical injury, and the description of the victim's condition to the effect that he was vomiting extensively, bleeding profusely and unconscious at the time he was taken to the hospital, which corresponds with the condition of the person when he was first treated by the doctors, are all consistent with the finding that the person shot by petitioner was the same person whom the doctors treated, and who died the following day."

The reported cases, both civilian and military, contain many instances of the use of what has been termed "similarity of incidents" to establish the chain of identity in situations like the one with which we are here concerned. Recognizing again the importance of detail in the present problem, we refer to the following decisions as illustrative of the principle involved: Isaacs v. United States, 159 US 487, 40 L ed 229, 16 S Ct 51; Lee v. State, 144 Tex Cr 135, 161 SW2d 290; Desilvey v. State, 245 Ala 163, 16 So2d 183; Powell v. Commonwealth, 276 Ky 234, 123 SW2d 279;

**371**

People v. Preston, 341 Ill 407, 173 NE 383. The following military cases also appear generally relevant: United States v. Mowell, 78 BR 205; United States v. Cramer, CM 346905, 1 CMR 210, August 3, 1951; United States v. Kaiglar, 11 BR–JC 191.

## IV

It is further urged by appellate defense counsel that error was committed below in receiving at the ▮▮▮▮▮ ■ trial the testimony of Dr. Chung Ki Soo concerning the identity of the person whose dead body he examined. It will be recalled that, after testifying that the name of the deceased was Jong Ku Suop, the physician stated that he was not personally acquainted with the victim, but that the latter had been so characterized by neighbors who were present at the time of the examination.

We believe the assignment to be without merit. Quite generally, information as to name, place of residence, age, and the like, is largely, if not solely, hearsay in character. Wharton, Criminal Evidence, 11th ed., 1935, has this to say on the subject at § 469:

"It is a well-known exception to the hearsay rule that evidence as to the name by which a person is known, even though not the best evidence as to his true name, is admissible. . . . It is not essential for the prosecution to show by the best evidence that it designated the victim of a crime by his right name. It is competent for a witness to testify that the deceased was known by, or reputed to be of, a certain name."

In Wigmore, Evidence, 3d ed, 1940, § 667a, the learned dean in speaking of the same matter says:

"A person's name is the title by which habitually he calls himself and others call him. To know a person's name, therefore, is to have heard him so called by himself and by others. In strictness, such an utterance is not hearsay (post, § 1772), except where it is made as an assertion of fact. But, though it may be hearsay, as a source of information, yet it is universally relied upon as a source of knowledge. Courts have commonly accepted the testimony founded upon it."

And in a footnote to the Wigmore passage quoted above, the following colloquy from Heath's Trial, 18 How St Tr 152, is set down:

"Mr. Harwood, objecting to a statement that the witness say Lady Altham at Wexford: 'This evidence is founded upon a supposition that the lady he saw at Wexford was the Lady Altham; he says he was only told it was she, and cannot say it was of his own knowledge'; Witness; 'I am pretty certain the lady I saw was Lady Altham. I am told, sir, that you are counsellor Harwood; am I not to believe you are? I am told that gentleman is counsellor Daley; I am morally assured of it, and I believe it.' "

It is to be observed that two distinct factual situations may be present in cases involving the point with which we are concerned here. In one instance, testimony as to the name of an individual—usually the deceased or the accused—is presented to the court by a witness who knows this name through personal familiarity with the community reputation of the deceased or the accused as to name. In the other typical case, the witness is not acquainted personally with community reputation in this regard, but has obtained the information offered the court from a third party who resides in the community of the deceased or accused and is thus familiar with community reputation as to his name.

Some courts have distinguished between these two situations and have approved the reception of testimony from witnesses of the first type only. See, for example, Hopt v. Utah, 110 US 574, 28 L ed 262, 4 S Ct 202. Others have considered the distinction to be without merit and have held testimony from both sorts of witnesses competent. See Weems v. State, 148 Tex Cr 154, 185 SW2d 431; State v. Siverly, 140 Wash 58, 248 P 69; Thompson v. United States, 144 F 14 (CA 1st Cir). And

372

more generally see Hicks v. State, 75 Fla 311, 78 So 270; Hornsby v. State, 16 Ala App 89, 75 So 637; Toletti v. Bidizcki, 118 Conn 531, 173 Atl 223; Lightfoot v. State, 123 Tex Cr 176, 58 SW2d 81.

The present case appears to occupy a position midway between the two extremes mentioned above. Here it is true that the physician did not know the deceased personally, and had neither seen nor heard of him prior to the occasion of the post mortem investigation. At the same time, his testimony offered considerably more in the way of a predicate than mere information furnished by a third party familiar with community reputation as to the victim's name. His knowledge, in fact, appears to have come from several persons who were neighbors of Jong Ku Suop, and who referred to him by that name at the time all were together at the examination. In this respect the case would seem to differ markedly from Hopt v. Utah, supra, strongly relied on by appellate defense counsel. Virtually it may be said that Dr. Chung was himself acquainted with at least a limited sort of community reputation. Consequently we find no error in the court-martial's willingness to hear the doctor on the subject of identity, and hold that whatever weakness characterized his testimony should go rather to weight than to admissibility. It is to be noted in this connection that appellant did not at all question the alleged victim's identity at the trial, and that defense counsel did not there object to Dr. Chung's testimony, nor request that it be stricken. Analytically there is indeed something to be said for the position of appellate defense counsel in this matter. However, analysis and an assimilative approach frequently lead to results which are unsound functionally. We regard the present problem of name as sui generis—and viewing it realistically and practically, we cannot object to the action of the court-martial here.

V

Further assignments of error were made in the brief and argument of appellate defense counsel, and ably and forcefully presented to this Court. We have considered these claims with care, but find them to be without substantial merit. No detailed treatment of them is believed necessary to a proper disposition of the case.

The decision of the board of review will be affirmed.

Chief Judge QUINN and Judge LATIMER concur.