UNITED STATES, Appellee

v.

GEORGE C. SCHREIBER, Second Lieutenant, U. S. Air Force, Appellant

5 USCMA 602, 18 CMR 226

No. 5468

Decided April 15, 1955

Latham Castle, ESQ., Grenville Beardsley, ESQ., COL A. W. Tolen, USAF, and MAJ Norman F. Carroll, USAF, for Appellant.

LT COL Harold Anderson, USAF, MAJ William G. Carrow, III, USAF, and CAPT Giles J. McCarthy, USAF, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Following trial by general court-martial, Lt. George C. Schreiber was convicted of the premeditated murder of Bang Soon Kil, a Korean, and of conspiracy to murder the same individual, violations of Articles 118 and 81, respectively, Uniform Code of Military Justice, 50 USC §§ 712, 675. He was sentenced to dishonorable discharge, total forfeiture of pay and allowances, and confinement at hard labor for life. The convening authority approved the findings, but reduced the confinement to a period of five years, and changed the designation of the punitive discharge to dismissal. The findings and the sentence, as modified, were affirmed by a board of review in the office of The Judge Advocate General, United States Air Force. We granted the accused's petition for review of a number of assignments of error.

The events out of which these charges grew had their inception in an ammunition dump located a short distance from an Air Force base in Korea. At about 11:30 p.m., September 26, 1952, Airman First Class Kinder, who was on post as a guard in the dump, observed a prowler. The prowler ignored his order to halt, so Kinder fired a warning shot over his head. When this did not stop the stranger, Kinder overtook and quickly subdued him. Attracted to the scene by the gunshot, Airman First Class Toth, a sergeant of the guard, put the prowler, a Korean, into the guard jeep to bring him to the Air Police Operations office. En route, Toth ordered the driver to stop. Dismounting, Toth drew a pistol from its holster and, according to a witness, struck the Korean about the head several times for no apparent reason. When the group arrived at the Operations office, the semiconscious Korean was brought in and laid on the floor. Toth explained that the Korean had reached for his gun, and it was necessary to forcibly restrain him. The accused was summoned, and, upon his arrival, was advised of the episode. According to Kinder, the accused and Toth conversed out of the hearing of the others. At the close of this conference, the accused asked Toth where the Korean should be taken. The latter, referring to the ammunition dump, replied "B–14, Sir." The accused then asked Kinder whether he could take the Korean "up on the hill and shoot him." When Kinder protested, the accused ordered him to get his carbine and accompany Toth, who put the Korean into a truck. Kinder complied. As the truck left, the accused telephoned the main gate of the base instructing the guard on duty to permit it to leave. Upon completion of this call, Sergeant Rumpff, Sergeant of the Guard, asked whether the Korean was to be turned over to the National Police. The accused told him that he was to be taken to the bomb dump and shot. Three shots were heard, and Rumpff was sent out to investigate. At the dump, he observed the Korean he had seen earlier at the Operations office lying face down on the ground. He had been shot. Rumpff returned and reported this to the accused. Medical authorities were summoned, and Airman Third Class Zapulla was dispatched to the scene with an ambulance. Zapulla returned the Korean to the local dispensary where a gunshot wound on the right side of his chest and lacerations of the lower right eye and scalp were observed. Since his blood vessels had apparently collapsed, efforts to administer blood plasma failed, and he died soon after his arrival, showing evidence of shock. Zapulla then brought him to the Civil Affairs Section Dispensary in Pusan. Chai Chan Yo, a doctor on duty at that institution, examined the body, noted the injuries, and determined that the cause of death was a gunshot wound. No autopsy was performed. After preparing the death certificate, he returned the body to the ambulance driver for delivery to the morgue. A slip of paper found on the dead person bore the name Bang Soon Kil, and he was so designated thereafter.

An entry was made in the log book to the effect that a Korean had been found in the dump and shot. The following morning, Kinder, accompanied by the accused, went to the Air Police Investigating Section. There he gave a false

605

account of the events of the preceding evening.

During January 1953, an investigation of the Korean's death was initiated. Lt. Schreiber called a meeting of the air policemen who were assigned to the company on the date of the incident, advised them of the investigation, and informed them that under Article 31 of the Code, 50 USC § 602, they were not required to say anything about the shooting. Later, he directed Staff Sergeant Ballard to write to Kinder and Toth, who had returned to the United States, giving them the same advice and reminding them that the accused was the responsible officer.

Captain Ralph Robins, a qualified doctor, was present throughout the trial at the request of the accused. After hearing the testimony relative to the beating received by the Korean prior to being shot, he expressed the opinion that the injuries resulting from it conceivably could have caused the death. In the absence of an autopsy, he said it was impossible to trace the path of the bullet fired by Kinder, and to determine from the organs affected by the missile whether death resulted from that source. Upon cross-examination, he agreed that a gunshot wound in the chest would cause some degree of shock, which would be a contributing factor in the death of the victim.

To impeach the credibility of Kinder, the defense produced Toth who described a conversation with Kinder a short time before trial. In it, Kinder advised him that they "should stick together in this," and should not worry about Lt. Schreiber.

Other defense witnesses described conditions in the accused's organization prior to his assignment. It was testified that pilfering by the local inhabitants at the ammunition dump had assumed serious proportions, amounting to some $50,000 per month. As a direct result of the accused's efforts, this figure was immediately cut to a negligible amount. It was agreed also that the morale of the organization, before the accused assumed command, was exceedingly low. By his attention to the personal needs, appearance, and performance of duty of the enlisted men, the accused transformed the unit into a capable, trustworthy organization. It was further shown that enemy guerillas operating in the general area had destroyed other ammunition dumps, and, because of this, tension at this base constantly increased.

Testifying in his own behalf, the accused asserted that upon arriving at the Operations office, he examined the clothing of the Korean but was unable to find any means of identification. He then ordered him taken out, intending that the Korean be brought to the gate and turned loose. As Toth was taking him out, Kinder appeared on the scene. The accused ordered him to take his carbine and accompany Toth. When Kinder asked whether that was an order, he told him it was. He denied giving an order to shoot the Korean. Later he heard the sounds of gunfire. He went to the dump where he was told that "Kinder shot a Gook." He did not think this was the same person he had seen at the Operations office. Consequently, he signed a report of the incident which related that "a Korean had been found in bomb dump area and shot." Since this was the first time a guard had been attacked by a Korean, he cautioned the men against talking about the incident and thereby magnifying its importance in their minds. He admitted calling a meeting of his men when he learned of the investigation, explaining that he thought during the course of the investigation they "would be shaken up if they had anything to be shaken up about"; and he was concerned about their welfare. For the same reason, he sent letters to Toth and Kinder and to others who were present that night, who had returned to the United States.

Employing four separate approaches to the problem, the accused first attacks the sufficiency of the evidence to sustain the findings on the murder charge. He argues that the evidence of the severity of the beating administered by Toth was such as to result in the victim's death. Thus, there is no showing that the shooting was causally connected with the death. In support of this conclusion, appellate defense coun-

sel have urged upon us the testimony of Captain Ralph Robins to the effect that in the absence of an autopsy it is impossible to determine the cause of death. Opposed to this, however, is the testimony of the Korean doctor who very positively described the principal cause of the victim's demise as a "gunshot wound." Moreover, Captain Robins willingly conceded that such a wound would cause shock—a contributing factor in the resulting death. Thus, it is apparent that however the court-martial resolved the factual conflict created by the medical testimony, the evidence presented by both sides established, at the very least, that the shooting contributed to the ultimate result. This is sufficient. Payne v. Commonwealth, 255 Ky 533, 75 SW2d 14; State v. Weston, 155 Ore 556, 64 P2d 536; State v. Francis, 152 SC 17, 149 SE 348; State v. BeBee, 133 Utah 939, 195 P2d 746.

Apart from the issue created by this conflicting testimony, the accused contends that the evidence ▆▆▆▆▆▆ ▆ fails to show that the person examined by Dr. Chai Chan Yo was the same person who was beaten by Toth and shot by Kinder. This contention is without merit. Sergeant Rumpff, who was present during the time the deceased was in the Operations office, testified that he saw the same person after he had been shot by Kinder. The testimony of the ambulance driver concerning his transportation of the victim from the bomb dump to the various dispensaries and finally to the morgue identified the victim as the person observed by the witnesses at each location. Shedding further light on the matter is the additional identification of the victim by Rumpff through photographs taken by the investigators at the morgue. Taken as a whole, this evidence in a compelling degree established the identity of the deceased as the person first seized by Kinder and brought to the Operations office by Toth. United States v. Roman, 1 USCMA 244, 2 CMR 150; United States v. Jarvis, 1 USCMA 368, 3 CMR 102; United States v. Clark, 1 USCMA 201, 2 CMR 107. The further contention of the accused that the slip of paper found on his person was insufficient because it was hearsay is similarly without merit. United States v. Jarvis, supra. Also without merit is a defense assertion that the death certificate was inadmissible because the examining physician's name was signed "Choi Chang Yup" when, in fact, his name was Chai Chan Yo. Doctor Chai appeared as a witness and reiterated the information set out in the challenged document and acknowledged signing it.

In his final argument upon the issue of the sufficiency of the murder evidence, the accused submits ▆▆▆▆▆▆ [3] that his responsibility for the killing was not established. As the predicate for this, he points out that Kinder, under a life sentence for this same crime, had a strong motive to commit perjury; that Master Sergeant Addleman, who originally testified that the accused had told Kinder to "take the Korean out to the bomb dump and shoot him," had changed his testimony and declared that the accused had said to take him out and "get rid of him"; that Rumpff, whose testimony is described above, disliked the accused and thus would twist his testimony to show him in an unfavorable light; and that Lt. Penabaker's testimony was merely an expression of opinion rather than a positive statement of fact. All of these factors, it is argued, destroyed the value of their testimony. The accused's guilt, therefore, was not established to the required degree.

Without reviewing in detail the testimony of these witnesses, we note that the court-martial accepted the essentials of their testimony and arrived at the conclusion that the accused was guilty. The board of review after examining this evidence in detail, and specifically "evaluating the varying motives underlying the testimony of each witness," arrived at a like conclusion. Its opinion is set out in full in 16 CMR 639. Since credibility is a matter to be determined by the triers of fact, and no clear abuse of discretion is shown, we shall not disturb these findings. United States v. Hunter, 2 USCMA 37, 6 CMR 37.

We turn now to a consideration of the accused's second principal assignment of error in which he ▮▮▮ challenges the sufficiency of the evidence upon the conspiracy charge. As to this and relying upon United States v. Saglietto, 41 F Supp 21 (ED Va), he says that since Kinder's participation in the crime was the result of a military order, there was no "agreement" and, hence, no conspiracy. However, Airman 2d Class Renteria, a defense witness, described Kinder's remarks at about the time of the shooting. These statements alone indicate conclusively that his activities were not coerced. Thus, it is clear from the actions of the alleged conspirators, Lt. Schreiber, Toth, and Kinder, that they had entered into an agreement "to accomplish, by concerted action, an unlawful purpose." The remainder of the proof established beyond question the performance of the overt act "to effect the object of that agreement." This satisfies the requirements of proof under Article 81, supra. Morton v. United States, 60 F2d 696 (CA 7th Cir), cert den 288 US 607, 77 L ed 982, 53 S Ct 401; paragraph 160, Manual for Courts-Martial, United States, 1951.

It is next argued that the law officer erred to the prejudice of the accused by failing to instruct upon the ▮▮▮ lesser included offense of aggravated assault. It is contended that the commission of this offense was put in issue by the defense testimony to the effect that it was impossible to determine the cause of death. However, the cause of death was described by Dr. Chai as a gunshot wound. As pointed out above, the testimony of the defense witness, Captain Robins, established that this same wound, was, at the very least, a contributing factor. Hence, the lesser included offense was not fairly and reasonably raised, and there was no obligation to instruct thereon. United States v. Roman, 1 USCMA 244, 2 CMR 150; United States v. Davis, 2 USCMA 505, 10 CMR 3; United States v. Lee, 3 USCMA 501, 13 CMR 57.

It is next argued that trial counsel and assistant trial counsel were disqualified because they had ▮▮▮ acted as investigating officers. The factual basis of this assignment was developed at the trial when the defense challenged their competency to service in their designated capacities. It was shown that during May 1953, the staff judge advocate, knowing of the report by the Office of Special Investigations, advised these officers that if charges growing out of the report were referred to trial, they would be appointed as trial counsel and assistant trial counsel, respectively. He, therefore, directed them to prepare for trial. Because the report was, as they described it, "a jumbled-up mess," they interviewed several witnesses including Lieutenant Penabaker and Master Sergeant Addleman, whose original statements showed no evidence of the accused's criminal connection with the case. As a result of these interviews, further statements elaborating upon and clarifying their original version of the events were obtained. Thereafter, the charges were referred to trial.

Article 27 (a) of the Code, supra, 50 USC § 591, provides that "No person who has acted as investigating officer . . . in any case shall act subsequently as trial counsel, assistant trial counsel . . . in the same case." The mandatory nature of this provision cannot be minimized. However, it is equally clear that one who has an official function to perform requiring him to ascertain the nature of the evidence which he is, or will be, required to present to a court-martial, does not fall within the proscription of Article 27 (a). United States v. Lee, 1 USCMA 212, 2 CMR 118; United States v. Stringer, 4 USCMA 494, 16 CMR 68. In the latter case, we said:

". . . [I]t is clear that some degree of differentiation was intended between those who make inquiries *qua* investigators and those who do so in the performance of their duties as counsel."

This contention, therefore, is without merit.

During the course of the court's examination of the accused, the following incident occurred:

"BY COLONEL PERRY:

. . . . . . .

"Q. Going back to the Air Police Operations shack again. You have heard numerous witnesses testify that they concluded from the activities in the operations shack that the apprehended individual was to be taken out and shot.

"IDC: I move to strike that question, on the grounds it is contrary to the evidence. Many witnesses have not so testified. It shows misconstruction of the evidence, Sir.

"LO: Objection sustained."

After a brief recess taken at the request of individual defense counsel, a challenge for cause was lodged against Colonel Perry, and the defense requested him to take the stand for interrogation thereon. The law officer indicated that he would accede to the request, but directed that the interrogation of the accused be completed before the challenge procedure was followed. No objection to this was made by the defense. The challenged member then amended his question by substituting "one individual" for the term "numerous witnesses," and the interrogation of the accused continued to its completion. Colonel Perry was called to the witness stand for interrogation upon the challenge for cause predicated upon the claim that his general demeanor indicated hostility to the accused.

On this phase of the case, appellate defense counsel contend that the law officer erred by failing to stop the proceedings and dispose of the challenge as soon as it was asserted. Since the law officer is responsible for the orderly conduct of a trial, his ruling on such a question is not subject to review in the absence of a clear abuse of discretion. No such abuse appears here; and, in view of the failure of the defense to object to the procedure followed, the matter cannot be raised for the first time upon appellate review.

Cf. United States v. Gravitt, 5 USCMA 249, 17 CMR 249.

The next defense assignment argued before us deals with accomplice testimony. The defense maintains that if the testimony of the prosecution's witnesses is taken at face value, each of them was an accomplice whose testimony should be viewed with great caution. Consequently, the law officer was under an obligation to instruct the court, sua sponte, that such testimony is to be appraised with the greatest care. In support of the assignments predicated upon this contention, the defense argues that since each of the witnesses in whose presence the accused ordered the Korean killed was an Air Policeman, all were under a duty to prevent the homicide. Their failure to act, coupled with their subsequent deliberate concealment of the facts, made them accessories after the fact. This argument was urged upon us by able and eminent civilian counsel, who demonstrated a keen perception of the history of military law. But our answer is necessarily brief. Generally speaking, an accomplice is one who aids or abets the principal wrongdoer in the commission of an offense. It is immediately apparent that none of the witnesses for the prosecution, other than Kinder, falls within this category. Consequently, as to these witnesses, the assignment is without foundation in fact. Although Kinder was an accomplice of the accused, the findings in the instant case do not depend to any great extent upon his testimony. A number of independent witnesses supplied through their testimony substantial support for the findings upon each offense charged. Kinder's testimony was largely cumulative. Thus, the situation is materially different from that found in Lett v. United States, 15 F2d 686 (CA 8th Cir). Under these circumstances the absence of a request for special instructions precludes consideration upon appeal. Caminetti v. United States, 242 US 470, 61 L ed 442, 37 S Ct 192. Cf. United States v. Bey, 4 USCMA 665, 16 CMR 239.

In other assignments of error additional defects in the instructions, as

well as improper cross-examination of the accused, are urged upon us by the defense. We have carefully reviewed the record of trial, and the claimed irregularities. It is apparent to us that the accused was convicted upon sufficient evidence, after a trial in which he was ably defended by counsel of his choice. The instructions of the law officer were fair and complete, and in accord with the obligations imposed upon him by Article 51 (c) of the Code, supra. The board of review carefully considered each defense assignment of error not otherwise set out herein, and has set forth its views in a well-prepared opinion. That opinion adequately and correctly disposes of the problems presented by the accused's additional assignments of error and there is no necessity to elaborate upon it.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

Judge LATIMER concurs in the result.