UNITED STATES, Appellee

v

RICHARD PLAUT, Private, U. S. Marine Corps, Appellant

18 USCMA 265, 39 CMR 265

No. 21,535

April 25, 1969

*Lieutenant Stephen W. Grafman,* JAGC, USNR, argued the cause for Appellant, Accused.

*Captain Lester G. Fant, III,* USMCR, argued the cause for Appellee, United States. With him on the brief was *Colonel C. R. Larouche,* USMC.

## Opinion of the Court

DARDEN, Judge:

The appellant was brought to trial before a general court-martial convened at Lake Mead Base, Nevada, for the breach of a lawful order and for involuntary manslaughter, violations of Articles 92 and 119, Uniform Code of Military Justice, 10 USC §§ 892 and 919, respectively. Contrary to his plea, he was found guilty as charged and given a sentence of confinement at hard labor for twelve months and forfeiture of $68.00 per month for a like period. Both the findings and the sentence remain unchanged. The case comes to us for consideration of three issues. The first is:

### I. Dying Declaration

(A) Whether the alleged dying declaration of Corporal Solis meets sufficient standards of completeness to allow for its admittance into evidence.

(B) Even assuming arguendo that it does, whether the law officer erred by his failure to submit to the court members (the finders of fact) for their ultimate factual determination the question whether the declaration sufficiently meets the criteria to be denominated a dying declaration.

(C) Whether the law officer erred by his failure to give a proper cautionary instruction to the court members concerning the weight and credibility to be accorded such a declaration.

The trial record sadly reflects that about 12:30 a.m., January 7, 1968, accused and Corporal Solis were posted as guards at Q Gate, Lake Mead Base,

267

Nevada. The Corporal of the Guard had assigned each man a pistol holding a magazine with five rounds. The serial number of each weapon was recorded, as was the name of the assignee.

Later that morning, the Corporal of the Guard returned to Q Gate in response to a radio call. He found Corporal Solis conscious on the "floor," but bleeding from a neck wound. Two pistols were nearby. Prosecution evidence adequately shows that these were the weapons assigned to the two men and that accused's weapon had been fired.

Corporal Solis received mouth to mouth resuscitation from two corpsmen and was then carried in an ambulance to the emergency room of the base hospital. Doctors immediately made a neck incision, inserted an endotracheal tube, and then made use of an artificial respirator, thereby assuring the Corporal an adequate air supply. He suffered from a bullet wound in the neck that severed his spinal column, causing complete paralysis.

The medical testimony of two doctors who cared for the victim indicated that the wounded Marine was conscious the entire time spent in the hospital until death. He was rational and gave intelligent responses. Doctors communicated with Solis by patting his head to gain attention. He responded to their questions with either a blink of the eyes or a slight shake of the head. Both medical officers thought that the victim believed death imminent.

During this emergency treatment, the Catholic Chaplain arrived to give the victim last rites. This witness testified that he spoke to Solis, calling him Ricardo and asking: " 'You know me, don't you?' " When Corporal Solis opened his eyes, the Chaplain said: " 'Ricardo, you are in a bad way. I am here to give you the last rites. Now if you are aware of who I am, make some sign, will you?' " Solis then opened his eyes wide and blinked. Father Raemers then related: "I realized then he knew that I was

standing there and I gave him the last rites." The witness believed the victim remained conscious during the ten-minute period involved.

Captain Beckner, appointed to conduct an informal investigation of the incident, related that he had gone to the hospital on January 7 with a list of twelve questions. With permission, he went to the Corporal's room accompanied by the attending physician. At this time the patient indicated he knew the doctor, was oriented, and in no pain. He also acknowledged the presence of Captain Beckner and indicated a willingness to answer questions.

The Captain did not follow his planned order of questioning. From the list of twelve, he asked but three questions. Although one of the doctors testified otherwise, the Captain asserted that the doctor ended the questioning by saying: " 'If you really feel that you need to ask him some more, go ahead and ask some more, but I prefer you didn't.' " The Captain then related:

"The first question I asked was 'Did PFC Plaut draw his own pistol from its holster?' Corporal Solis answered 'Yes,' by a nod of his head, affirmative nod of his head. The second question I asked was 'Was PFC Plaut holding his own pistol when it discharged?' Again Corporal Solis answered with an affirmative nod of his head. The third question and last question which I asked 'Did PFC Plaut shoot you with his pistol?' Again Corporal Solis nodded his head 'Yes.' "

The next day this officer returned to the hospital desiring a further period of questioning but found the Corporal unavailable. Later that day Corporal Solis died.

The Manual for Courts-Martial, United States, 1951, provides that in a trial for murder, manslaughter, or negligent homicide, dying declarations of the alleged victim are admissible to prove the circumstances of the act that caused the dying condition, including the identity of the actor. This

paragraph of the Manual further provides:

". . . The declaration must have been made while the victim was in extremity and under a sense of impending death, although it is not necessary to show that the victim asserted that he was under this impression if that fact is otherwise established. There is no requirement that death immediately follow the declaration, but if it was made while the victim had a hope of recovery it is not admissible under this exception to the hearsay rule even though he died shortly thereafter. If not obtained by duress or under circumstances indicating that the declarant may have been misled, a dying declaration is admissible even though it was made in answer to leading questions or upon urgent solicitation. The declaration may be by spoken words or intelligible signs or it may be in writing. A declaration which was made by a person who would not have been competent as a witness may not be received in evidence under this exception to the hearsay rule, nor may a dying declaration or part thereof be received in evidence even though the declarant would have been competent as a witness, if for any reason it would have been inadmissible as testimony given on the witness stand by the declarant." [Paragraph 142a.]

This Court has written little on the subject. However, in United States v DeCarlo, 1 USCMA 91, 1 CMR 90, a unanimous Court did declare:

". . . The authorities are uniform in defining, if not in applying, the basic rule relative to the admissibility of such statements. Dying declarations are admissible when they constitute statements made by a person after a mortal wound has been inflicted, under a belief that death is certain, stating the facts concerning the cause of, and the circumstances surrounding, the homicide." [Id., at page 92; cf.

United States v Smith, 5 USCMA 314, 320, 17 CMR 314.]

It is commonly recognized that a dying declaration is admissible as an exception to the hearsay rule. As such, it also constitutes an exception to the right of an accused to confront his accuser. Cf. Pointer v Texas, 380 US 400, 13 L Ed 2d 923, 85 S Ct 1065 (1965). It is founded on the demands of justice and in the belief that one about to die is not likely to distort the truth. If otherwise admissible, a dying declaration may be proved by any competent witness. It may be oral, written—either in narrative or questions and answers—or in any other form that will convey the thoughts of the declarant. It is a device generally restricted to the criminal prosecution of homicide[1] "in which the death of the declarant is the subject of the charge and the circumstances of the death are the subject of the declarations." 40 Am Jur 2d, Homicide, § 347. It is confined to circumstances immediately attending the homicide and forming a part of the res gestae. "If the statement in question is conjecture only, or an inference based on collateral facts, then it should certainly be excluded. But where the statement is based on facts properly before the court, and where it constitutes but a shorthand summary of circumstances known to the declarant, it is, in our view, admissible in evidence." So spoke this Court in United States v DeCarlo, supra, at page 93. Matters not immediately connected with the fatal occurrence are excluded. Annotation, Dying Declarations— Prior Events, 14 ALR 757.

When the declaration is made, the declarant must have the fixed belief that death is a certainty. There must be a "[d]espair of recovery." Fear or even belief that illness will end in death is not sufficient, for "'a settled hopeless expectation'" is required. Shepard v United States,

[1] See Wigmore, Evidence, 3d ed, §§ 1430, 1431; Warren on Homicide, Perm ed, § 243; Annotations, 49 ALR 1282 and 91 ALR 560.

290 US 96, 100, 78 L Ed 196, 54 S Ct 22 (1933). But *Shepard* also makes it clear that "[t]here is no unyielding ritual of words to be spoken by the dying." Indeed, despair may be gathered "though the period of survival outruns the bounds of expectation." Thus, there need not be "a belief or apprehension of immediate and instant dissolution." 40 Am Jur 2d, Homicide, §§ 366, 368; People v Warren, 259 Ill 213, 102 NE 201 (1913). It is the "impression of the impending death" rather than the "rapid succession of death" that makes for admissibility. The critical factor, therefore, is the declarant's state of mind, not the time intervening between a declaration and the death of the decedent. Ayers v State, 215 Ga 325, 110 SE2d 669 (1959); State v Brown, 209 Minn 478, 296 NW 582 (1941). Yet, the time interval, if long enough, may nonetheless cast doubt upon the person's "[d]espair of recovery." Emmett v State, 195 Ga 517, 25 SE2d 9 (1943), certiorari denied, 320 US 774, 88 L Ed 464, 64 S Ct 76 (1943). However, a five-month lapse between the declaration and the death of the declarant did not render the statement inadmissible in State v Craine, 120 NC 601, 27 SE 72 (1897). Similarly, it has been held that a declaration is admissible, though made while hope lingered on, if it is afterwards reaffirmed when hope is gone. Cooper v State, 182 Ga 42, 184 SE 716, 104 ALR 1309 (1936), and accompanying annotation.

The introduction of a dying declaration must be preceded by an offer of proof that establishes the existence of those conditions that render the declaration admissible. Proof of the preliminary fact that the declarant spoke in contemplation of death may be shown by existing circumstances although nothing is said respecting death. This may include facts relative to the mental and physical condition of the victim, the nature and extent of wounds that make obvious the impossibility of survival, the declarant's own conduct and statements, and the receipt of the last rites of the

church of his faith. Commonwealth v Peyton, 360 Pa 441, 62 A2d 37 (1948); 40 Am Jur 2d, Homicide, § 382; Warren on Homicide, Perm ed, § 257. In Morehead v State, 12 Okla Crim 62, 151 Pac 1183, 1189 (1915), the court presented the rule in this way:

". . . A sense of impending death may be inferred from the character of the wound, from the opinion of his physician, and from other circumstances showing his state of mind.

"Says Greenleaf:

'It is enough if it satisfactorily appears, in any mode, that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind.' Section 158."

Compare Fulton v State, 209 Miss 565, 47 So 2d 883, 885–886 (1950), where the court observed:

"The rule is laid down as: 'It is well settled that the sense of impending death which a dying person must have had in order to render a dying declaration made by him admissible in evidence may be inferred from the nature of the wound or the state of his illness, without any express declaration to show that he was sensible of impending death. It is clear, however, that this rule does not mean that the inference may be drawn from the mere fact that the wound, in the opinion of the man of science, was in point of fact mortal, but means that the nature of the wound or the illness should have been such as to affect the knowledge and control the opinion of the dying person himself, as to the danger to which he stood exposed. Evidence of a physician's opinion as to a declarant's condition

at the time of making declarations is admissible not only to show the latter's state of mind, where such opinion was communicated to him, but also to show that the declarant was actually in a condition from the very nature of which he would have had a sense of impending death.' 26 Am Jur, Homicide, Sec 421."

We have no doubt that in the case before us, Corporal Solis answered Captain Beckner's question while fully competent and with an awareness of his dying condition. The circumstances of this case that we have previously set out and that encompassed every factor enumerated in the preceding paragraphs permit no other conclusion.

However, the requirement is well set that completeness of the declaration, whatever its form, is a necessary prerequisite for admissibility. Difficult to apply, the bounds of this requirement are well shown by the two following excerpts:

". . . What we understand by the expression, that the statement 'must be complete in itself,' is, not that the declarant must state everything that constituted the *res gestae* of the subject of his statement, but that his statement of any given fact should be a full expression of all that he intended to say as conveying his meaning as to such fact." [State v Patterson, 45 Vt 308, 12 Am Rep 200 (1873).]

"The rule that dying declarations must be complete does not mean that all of the affairs of the deceased must be related. It means that the statement must be complete as far as it goes. If a dying person finishes the statement he wishes to make, it is no objection that he has told only a portion of what he might have been able to tell. State v Nettlebush (1866) 20 Iowa 257; State v Patterson (1873) 45 Vt 308, 12 Am Rep 200; State v Tubbs (1928) 101 Vt 5, 139 A 769." [See Annotation, Dying Declarations—Incompleteness, 94 ALR 679.]

These authorities are clearly speaking of a concept affirmative in nature in which the measurements are taken of those things said, unconditioned by that which was left unsaid. The narrative or the answers to questions presented must in each instance stand on its own, to be either accepted or rejected. Accordingly, we believe—contrary to the assertions of the defense—that the responses of Corporal Solis to the questions asked him by Captain Beckner represent individually that degree of completeness that permits their admissibility as a dying declaration. We do so believing with certainty that each is "a full expression of all that . . . [the Corporal] intended to say" in response to the question asked and that each, therefore, is "complete as far as it goes."

Considered *in toto*, Corporal Solis's statement meets the designation of a dying declaration. We believe the prosecution has carried its burden of meeting those prerequisites necessary to permit the introduction of the declaration into evidence.

There is agreement that the law officer has the initial responsibility of determining admissibility. Appellate defense counsel also agree that under the majority rule the law officer exclusively determines whether or not a proper foundation has been presented for the admission of the assertions as dying declarations. The contrary view, however, is that the law officer determines whether a *prima facie* showing has been made on the question of admissibility, with the ultimate decision left for submission to the finders of fact. Contending that neither the Uniform Code of Military Justice nor the Manual for Courts-Martial offers guidance in this area, counsel for the defense believe that our adoption of the latter view would be more consonant with the Court's earlier holdings that questions of fact should be left to the jury.

Appellate Government counsel, in turn, refer to Article 51(b) Code, supra, 10 USC § 851, for this Article specifically provides that the law of-

ficer or the president shall rule upon interlocutory questions and that such rulings are "final and constitutes the ruling of the court."

In this regard, we note that paragraph 142a, Manual, supra, makes no specific provision that restricts the law officer's ruling to the question of admissibility of dying declarations, unlike paragraph 140a, Manual, supra, which concerns admissions and confessions and which leaves the question of voluntariness for the ultimate determination of the jury.

Our adoption of the majority rule in this case is consistent with both the Code and the Manual and, contrary to the arguments of the defense, does not deprive the court of its fact-finding function. In essence, these arguments ignore the distinction between admissibility and credibility, a distinction made clear by the following quotation from State v Wright, 36 NM 74, 8 P2d 443, 445–446 (1932):

"While there is a minority view which supports this statement of the law, the decided weight of authority is to contrary. Under the majority view which we favor, whether the tendered declaration was made under the sense of impending death is a preliminary matter to be determined by the court. Having so determined, the declaration is admissible, and it is not properly within the jury's province to overrule the court and say it was not so made. 3 Wigmore on Evidence (2d Ed) § 1451; Wharton's Criminal Evidence (10th Ed) § 296b, p. 577; 4 Encyc. of Evidence, 948; 2 Jones' Com. on Evi. § 332, p. 774; Case Notes, 56 LRA 434; 16 LRA (NS) 660. Once admitted, it is for the jury to appraise the same. It will determine the truth or falsity of the claim that the tendered declaration was in fact made, the accuracy or inaccuracy, good faith or imposition in the witness' recital of it, and generally pass upon the weight to which it is entitled. Gurley v State, 101 Miss 190, 57 So 565."

Instructions on credibility, say this

Court's previous cases, must be requested, for "the absence of a request for special instructions precludes consideration upon appeal." United States v Schreiber, 5 USCMA 602, 609, 18 CMR 226; United States v Flippen, 16 USCMA 622, 37 CMR 242. It is equally clear, however, that in those instances where the lack of such an instruction would result in a clear miscarriage of justice, this Court has held the omission to be plain error under Rule 52(b), Federal Rules of Criminal Procedure. That was the holding in United States v Stephen, 15 USCMA 314, 35 CMR 286, and United States v Pond, 17 USCMA 219, 38 CMR 17. Both cases represent instances in which the evidence for and against the accused was in virtual equipoise. Credibility of the witnesses, therefore, was of paramount importance.

In *Schreiber,* the Court applied the general rule rather than the exception, for, in that case, testimony of an accomplice was largely cumulative. Thus, the absence of a *sua sponte* instruction on credibility would not have materially affected the result. So, too, in this case. Here, unlike *Pond* and *Stephen,* prosecution's presentation consists of more than the introduction of a dying declaration. The strength of its case does not depend solely upon the effect of the declaration. Indeed, the evidence without the declaration clearly supports the findings. Under the circumstances reflected by this record of trial, as in *Schreiber,* we perceive no miscarriage of justice resulting from the omission of a *sua sponte* instruction regarding the credibility to be given the dying declaration of Corporal Solis.

The next assigned error asks:

II. Whether the accused's extrajudicial statement to Sergeant Horseley was improperly admitted into evidence.

Having received word of a shooting, Sergeant Horseley went to Q Gate for on January 7, 1968, he was Sergeant of the Guard. On the Sergeant's arrival, the first person he saw was the accused in the company of two other

Marines. Knowing that Plaut was a member of the guard at that post, he asked what had happened. Subsequently, at the Sergeant's suggestion, he and Plaut went to the guardhouse. The accused was permitted to roam about but spent much of his time in the guard supervisor's office. The Sergeant thought this best, for everyone present was asking questions that he didn't want the accused answering. He made no attempt to question or interrogate the accused. Nevertheless, Plaut told him that he hadn't meant to shoot Solis and that if Solis would live he would be willing to spend the rest of his time in the Marine Corps brig.

Trial defense counsel had objected to the court's receipt of this testimony because of the belief that during the time described the accused was in custody and that *Miranda*[2] precepts had been violated. An out-of-court proceeding clarified the problem, for testimony there showed first that, in response to the Sergeant's initial question at Q Gate, Plaut had replied that "Solis had come up behind him and drawn Plaut's pistol out of the holster and put it in his back and Plaut had turned around and when he did, he said that he had hit the pistol and it went off." This testimony brought out by the defense cross-examination of the Sergeant never reached the court and was in no sense relied upon by the prosecution in the presentation of its case. The Sergeant then went on to testify that at the time he was only aware that a shot had been fired and suspected at most a breach of a regulation. He was unaware that a man had been wounded and certainly suspected Plaut of nothing. We inject here the note that after this exchange, Captain Beckner found the accused had been the other member posted at Q Gate and then warned him of his Article 31 rights and of his right to counsel.

Regardless, Sergeant Horseley went on to relate further that while in the guardhouse he attempted to fulfill the

accused's request to speak to his Platoon Commander by placing a phone call to that officer. While so doing, the accused came forth with the statement that he hadn't meant to shoot Solis. At the time of this utterance the Sergeant was sitting on a desk trying to dial the Lieutenant's telephone number. There was no conversation between the accused and the Sergeant. There had been no attempt to interrogate the accused about the incident, no questions were asked, and no orders were given.

The record fails to show a relationship between the statement offered by the prosecution and the appellant's initial denial. Not only is there an intervening Article 31 warning between the two but their manifest inconsistency refutes the argument that the latter is but the poisoned fruit of the former. This record of trial satisfactorily shows the lack of relationship between these two utterances. Cf. United States v Bearchild, 17 USCMA 598, 38 CMR 396. We consider the latter to be completely voluntary. United States v Vogel, 18 USCMA 160, 39 CMR 160; United States v Hinkson, 17 USCMA 126, 37 CMR 390; cf. United States v Gorko, 12 USCMA 624, 31 CMR 210; United States v Ballard, 17 USCMA 96, 37 CMR 360.

The third issue before us is:

III. Whether Lieutenant Phillip J. Schwartz as a matter of law should have been disqualified from serving at trial as the assistant trial counsel.

Article 27(a), Uniform Code of Military Justice, 10 USC § 827, states in part that no person who has acted as an investigating officer in a case shall thereafter act as either the trial or assistant trial counsel in the same case. The allied papers before us show that Lieutenant Schwartz, the assistant trial counsel, acted initially as appointed counsel for the three-man board of investigation that inquired as to the facts and circumstances attending Corporal Solis's death. Included in the board proceed-

---

[2] Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966).

ings are exhibits revealing that the Lieutenant had written to Dr. Belliveau requesting clarification of certain matters the doctor had referred to following his examination of Corporal Solis's body.[3] Similar board exhibits show that as counsel, the Lieutenant had posed questions for Father Raemers.[4] Captain Beckner's testimony also indicated that Lieutenant Schwartz had prepared the twelve questions that the Captain tried to have answered by Corporal Solis before his death.

Following the board's recommendation that the accused be disciplined under Article 92, Code, supra, 10 USC § 892, for violating a base instruction, the Lieutenant, in the capacity as base judge advocate, submitted a memorandum to the Commanding Officer, Marine Barracks, Lake Mead Base, in which he indicated that four possible offenses were suggested by the evidence adduced during the investigation—involuntary manslaughter, violation of a lawful regulation, negligent homicide, and careless discharge of a firearm. He concluded that the charges on the first two above were most appropriate. The Commanding Officer of the Marine Barracks adopted the Lieutenant's views, as is indicated by his letter of transmittal of the board record to the Base Commander, who, in passing the record through the chain of command, concurred in the recommendations made by his subordinate. The pretrial advice in this case, however, was prepared by the staff judge advocate for the Commanding Officer, Field Command, Defense Atomic Support Agency, Sandia Base, Albuquerque, New Mexico.

The appellate Government counsel, in reply, note first that Captain Vogel, the assistant defense counsel, had represented the accused at the pretrial proceeding and thus was aware of the Lieutenant's earlier participation in the case. In the absence of objection and a show of prejudice at the trial level, appellate Government counsel see no reason for setting the

conviction aside. United States v Mickel, 9 USCMA 324, 26 CMR 104. They further argue that the allegation lacks substance for the proceeding shows only that the Lieutenant carried out his duties and in so doing did not subordinate or supersede the investigative body.

We are satisfied that in this case the actions of Lieutenant Schwartz did not preclude him from later serving as assistant trial counsel. In essence, this case is controlled by United States v Young, 13 USCMA 134, 32 CMR 134. We believe it is the character of the board proceeding in this case that brings about doubt as to the Lieutenant's activities. In a board of investigation proceeding the appointed counsel necessarily acts somewhat differently from and becomes more involved than the legal advisor to an Article 32 investigator, whose actions were at issue in *Young*. This does not mean, however, that one's action breaches Article 27(a), Code, supra, while the other's does not. The Manual of the Judge Advocate General, Department of the Navy, specifically provides under section 0505b:

"*Duties.* Counsel for the formal board, whether appointed or junior member, shall call witnesses and conduct the direct examination of all witnesses except those requested or called by a party. He shall arrange for a place of meeting of the board and for the assistance of reporters, interpreters, orderlies, and such clerical assistants as may be needed. Counsel for the board shall administer the oath or affirmation to the reporters, interpreters, and all witnesses, and he shall supervise the recording of the proceedings and the preparation of the record. It is the duty of the counsel for the board to bring out all the facts, in an impartial manner without regard to the favorable or unfavorable effect on persons concerned."

Our review of the proceedings shows Lieutenant Schwartz as simply fulfilling these responsibilities. This

---

[3] Board Exhibits 15 and 16.
[4] Board Exhibit 14.

is also true of the memorandum he subsequently wrote as the base judge advocate. This again was the fulfillment of his responsibilities in that capacity. We are in accord with the board of review who, in resolving this issue against the accused, reasoned:

"Viewing the earlier roles of Lt. Schwartz as counsel for the formal Board of Investigation and legal officer, we cannot agree that his conduct as such superceded [sic] the investigation board or disqualified him to perform as assistant trial counsel at the trial of the accused. Certainly, his conduct in gathering evidence for the investigation appears to be entirely consistent with the duties of counsel for the board prescribed by the JAG Manual. Nor is it considered that the legal advice given in his capacity as legal officer to the preliminary inquiry officer or to the Convening Authority of the investigation—following the board's admission of its findings, opinions and recommendations—disqualified him as assistant trial counsel. United States v Haynes, 7 USCMA 477, 22 CMR 267. The assignment of error is denied."

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I disagree with that portion of the principal opinion which finds no miscarriage of justice resulting from the omission of a *sua sponte* instruction regarding the credibility to be given the dying declaration of Corporal Solis. Cf. United States v Stephen, 15 USCMA 314, 35 CMR 286; United States v Pond, 17 USCMA 219, 38 CMR 17.

My brothers correctly disclose the uniqueness of a dying declaration as an exception to the hearsay rule; the safeguards that must be hurdled before it can be admitted in evidence; and, the fact that its use is generally restricted to the criminal prosecution of homicide. I agree with their adoption of the majority view that admissibility of a dying declaration is a question of law, for determination by the law officer alone, and that, thereafter, *the weight and credibility to be accorded thereto is one for the court members to decide.* As was stated in Commonwealth v Knable, 369 Pa 171, 85 A2d 114, 117 (1952):

". . . Whether the attendant facts and circumstances of the case warrant the admission of a statement as a dying declaration is in the first instance for the court, but, when admitted, the declarant's state of mind and the credibility, interpretation and weight to be given his statement are for the jury under proper instructions. . . . [Citations omitted]."

And in Wigmore, Evidence, 3d ed, § 1451(b), we find:

"After a dying declaration, or any other evidence, has been admitted, the *weight* to be given to it is a matter exclusively for the jury."

See also 40 Am Jur 2d, Homicide, § 387; citations collated in Annotation: Dying Declarations—Weight Of, 167 ALR 147, 153.

My brothers, in rejecting the need in this case for a *sua sponte* instruction, on the weight to be given the dying declaration, contend that the strength of the Government's case did not depend solely upon the effect of the dying declaration. Indeed, they find that the evidence without the declaration clearly supports the findings. I am constrained to view the evidence otherwise.

In the case at bar, the admissibility of the dying declaration was vigorously contested, with the law officer overruling defense counsel's objection. Since the matter was explored in an out-of-court hearing, the court members were unaware of the hearsay nature of the testimony and the fact that:

". . . *Such declarations should be received in evidence with caution since they are often made under circumstances of mental and physical*

*debility and are not subject to the usual tests of veracity."* [Manual for Courts-Martial, United States, 1951, paragraph 142a.] [Emphasis supplied.]

See also Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, paragraph 494.

The evidence in the declaration was vital to this case for, translated into narrative form, it told the court: (1) Private Plaut drew his own pistol from its holster; (2) Private Plaut was holding his own pistol when it discharged; and (3) Private Plaut shot me (Solis) with his pistol. More pointed and damaging evidence cannot be imagined, yet, the law officer's only direction to the court on this matter was the following:

"The statements made by Corporal Solis to Captain Beckner just prior to Corporal Solis' death may be considered by the court in determining the guilt or innocence of the accused as to Charge II and the specification thereunder [by culpable negligence did unlawfully kill Corporal Solis] only. This evidence which was testified to by Captain Beckner may only be considered by the court on Charge II and the specification thereunder in determining the guilt or innocence of the accused. It shall not be considered in determining the guilt or innocence of the accused as to Charge I and the specification thereunder [failure to obey an order not to remove his pistol from the holster except when necessary]."

The dying declaration also played a most important part in the argument of both counsel. Trial counsel argued that it was "direct evidence" and read for the court the three questions asked of Solis by Captain Beckner and the answers recorded by him. Defense counsel contended that the victim was not rational at the time of the Captain's interrogation and did not really communicate—he only nodded his head or blinked his eyes. In rebuttal the prosecution rebutted the defense's contention of irrationality and asserted that there was "direct testimony in the form of a dying declaration" that the accused chambered a round and had possession of the pistol at the time Solis was shot.

The record further reflects that the court members themselves were uncertain as to the strength of the evidence regarding the charged offense. In addition to being informed that one of the elements of involuntary manslaughter was that the accused acted with *culpable negligence*, the court was also instructed that it could find the accused guilty of the lesser included offense of negligent homicide, if it concluded that he was guilty only of *simple negligence*. As part of the defense's theory that Corporal Solis had taken Plaut's pistol from its holster and died as a result of horseplay, defense counsel adverted, in his argument, to the evidence reflecting that after the bullet passed through the victim's neck it lodged in a side wall of the guardhouse about an inch below the ceiling.[1] In order to obtain such a trajectory, accused, assertedly, would have to have been crouched low on the floor and some distance away. However, as defense counsel pointed out, powder burns on the neck of Corporal Solis disputed any such theory. The court was obviously impressed by the defense's theory of horseplay between the victim and the accused for, after having closed for deliberations, it reopened and requested the law officer to again instruct on culpable negligence and simple negligence.[2] In such circumstances, how can it be said that the dying declaration did not tip the scales against the accused?

[1] See photograph, Prosecution Exhibit 6. In addition, the court members visited the scene and personally viewed the evidence represented by the photograph.

[2] The court members' dilemma is not surprising when consideration is given to the fact that a pretrial board of investigation, convened at the Marine Barracks, Lake Mead Base, Las Vegas, Nevada, was of the opinion that "There is insufficient evidence to determine which person fired the round causing injury to Corporal SOLIS."

Without a clarifying instruction, the court members were permitted to consider this evidence in the darkness of misunderstanding. "[J]ustice tends to flourish in an enlightened atmosphere." United States v Smith, 13 USCMA 471, 474, 33 CMR 3.

In Armstrong v United States, 41 F2d 162 (CA9th Cir) (1930), the trial court's *refusal* to give a requested instruction on dying declarations was the central question in issue on appeal. However, the analysis by which the Court of Appeals reached its decision that the trial judge committed prejudicial error, seems, in my view, an effective argument for the need to instruct *sua sponte* on the question. I quote at length from the cited case.

"With other requests, defendant asked the court to charge the jury that: 'Evidence has been introduced to show what are ordinarily called the dying declarations of the decedent; that is to say, statements which it is claimed the decedent made when he was in immediate danger of death and had no hope of recovery. You should take into consideration the fact that such dying declarations were not given under oath and the defendant had no opportunity of cross-examination; and the testimony of all such declarations should be received and weighed by you with great caution.'

"Not only was the request declined, but the court failed to give any instruction of any kind upon the point. This, we think, was prejudicial error. The decided cases exhibit a wide diversity of view upon the general subject and it may be that the last clause of the request is technically subject to criticism, although it is not out of accord with some of the decisions and texts. See, for examples, Commonwealth v Meleskie, 278 Pa 383, 123 A 310, and Wharton on Homicide (3d Ed) p. 975. But, considering the gravity of the offense with which the defendant was charged, the request was sufficient to impose upon the court the duty of appropriately explaining to the jury the status of such evidence. Indeed, in some jurisdictions it seems to be held incumbent on the court of its own motion to give a proper instruction. See Pearson v State, 143 Tenn 385, 226 SW 538, 540, 541. Such evidence is exceptional, and the ordinary citizen, sitting as a juror, cannot be supposed to have knowledge of the reason of necessity underlying its reception, or to be quick to recognize its infirmities; and he may not fully appreciate the importance to a defendant of the usual right of cross-examination, the protection of which is denied him in such a case.

"We are unable to see how an instruction explanatory of this and other considerations and advising the jury of their duty to exercise care and caution in weighing such declarations would be violative of the Alaska statute providing that: 'In charging the jury the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges of all questions of fact.' Comp. Laws Alaska 1913, § 1023. To advise the jury of a general rule of law under which evidence is to be weighed or the credibility of witnesses is to be considered is not to state the facts of the particular case or to instruct upon an issue of fact. A general rule pertaining to evidence is nevertheless a rule of law. It is a common practice to charge that the testimony of an accomplice should be closely scrutinized and weighed with caution. It is still more common to advise them of general considerations which they should bear in mind in weighing the testimony of witnesses of different classes. They are informed that the testimony of one having an interest in the issue, not excluding the defendant in a criminal case, should be viewed and weighed in the light of that interest. It would hardly be urged that the statute above referred to is prohibitive of such practice. Indeed, in this par-

ticular case the court instructed the jury that they should take into account the conduct and appearance of the witness on the stand, the interest he had, if any, in the result of the trial, the motive he had in testifying, his relation to and feeling for or against any of the parties in the case; and, further, that there is a legal but rebuttable presumption that witnesses speak the truth, and, still further, that if they found that any witness had wilfully testified falsely in any particular they might distrust his testimony in other respects. It would seem to be highly inconsistent to hold that such a statute permits the court thus to advise the jurors of the considerations and rules under which they are to weigh testimony given by witnesses who are under oath and whom the defendant has the opportunity to cross-examine (all of which considerations and rules are presumably more or less familiar to a layman), and at the same time prohibits a statement of like character touching evidence not having the sanction of an oath, and emanating from a source not subject to cross-examination—a branch of evidence probably unfamiliar to most of the jurors. The instructions here touching the testimony of the living witnesses may very well have contributed to the prejudicial effect of the court's silence respecting the dying declaration. For example, the jurors were informed that they were to consider the motives of a witness in giving his testimony and his relation to and feeling for or against a party; but it was not pointed out that like considerations were to be borne in mind in weighing the dying declaration. See Pearson v State, supra.

"Without attempting an elaborate analysis or incorporating extensive excerpts, we may cite the following decisions as giving support to the general conclusion we have reached. While the precise question was not involved in People v Lawrence, 21 Cal 368, Mr. Justice Field there stated: 'Declarations of this char-

acter are received with the greatest caution. They are admissible on the ground of necessity.'

"In Commonwealth v Meleskie, 278 Pa 383, 123 A 310, 311, the Supreme Court of Pennsylvania approved an instruction that: 'Dying declarations should be received and weighed with great caution, as they are necessarily wanting in the test of credibility of cross-examination, in that the jury are without opportunity of observing the temper and manner of the declarant.'

"In Pearson v State, supra, among other things, the court said: 'In the case of the weight to be given to dying declarations, it is fundamental that the jury shall know from the court the methods which they are entitled to use and adopt in determining what weight ought to be given to them.'

"In Jackson v State, 155 Tenn 371, 293 SW 539, the same court, quoting from its earlier decision in Dickason v State, 139 Tenn 601, 202 SW 922, said: 'Ordinarily the trial court instructs the jury to receive a dying declaration with caution.'

"In the two cases, People v Kraft, 148 NY 631, 43 NE 80, 81, and People v Falletto, 202 NY 494, 96 NE 355, 357, the New York court seems unequivocally to hold that, as a matter of law, dying declarations cannot be given the same weight as testimony adduced under oath by witnesses who are subject to cross-examination; and the reasoning is persuasive. And such seems to be the doctrine of the Supreme Court of Washington. See State v Mayo, 42 Wash 540, 85 P 251, 255, 7 Ann Cas 881; State v Walker, 104 Wash 472, 177 P 315, 316. And see, also, State v Eddon, 8 Wash 292, 36 P 139, 143. In Coart v State, 156 Ga 536, 119 SE 723, 730, the syllabus, which was apparently prepared by the court, strongly supports the view we have taken. In the decision itself we find this expression: 'After a careful review of the evidence adduced to the court before the introduction of the written statement

(dying declaration), we are satisfied that the trial judge did not err in permitting it to go to the jury for its consideration, under rules for their guidance which were fully and correctly given.' See, also, Lipscomb v State, 75 Miss 559, 23 So 210, 230, and State v Doris, 51 Or 136, 94 P 44, 50, 16 LRA(NS) 660.

"Reversed, with instructions to grant a new trial."

Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. United States v Stephen, supra. As we said in United States v Ebarb, 12 USCMA 715, 718, 31 CMR 301:

". . . While we cannot pretend to understand counsel's failure to seek appropriate guidance for the court members, we are reluctant to charge the accused with responsibility when the result would be a clear miscarriage of justice. United States v Masusock, 1 USCMA 32, 1 CMR 32; United States v Smith, 2 USCMA 440, 9 CMR 70."

The law officer bears the prime responsibility for properly instructing the court. United States v Stephen, supra; United States v Nickoson, 15 USCMA 340, 35 CMR 312. As stated in United States v Williamson, 332 F 2d 123, 132 (CA 5th Cir) (1964):

"In the final analysis, it is not the parties who determine the charge the judge gives to the jury. The obligation rests squarely on the shoulders of the trial judge. Of course the system of time-tested rules of procedure can rightfully expect competent counsel to request appropriate charges or object to affirmative errors or significant omissions. But there are occasions, and this Court recognizes them year by year, in which the trial court's erroneous action has such immediate and significant consequence that it must be noticed as plain error."[3]

---

[3] See cases cited in Williamson v United States, 332 F2d 123, 132–133 (CA 5th Cir) (1964), footnote 13.

Since I believe that the law officer's failure to *sua sponte* give a proper instruction regarding the weight and credibility to be given the dying declaration of Corporal Solis was prejudicial error (United States v Stephen and United States v Pond, both supra), I would reverse the decision of the board of review and order a rehearing.

I am also in disagreement with my brothers' holding that Lieutenant Schwartz was not disqualified, as a matter of law, from serving at trial as assistant trial counsel.

At the time of the commission of the charged offenses, Lieutenant Schwartz was the Base Judge Advocate, Lake Mead Base, Las Vegas, Nevada. As such, he was the legal advisor to the Commanding Officer, Marine Barracks, Lake Mead. When the Commanding Officer of the Barracks directed the convening of a formal board of investigation to inquire into the circumstances surrounding the shooting and subsequent death of Corporal Solis, Lieutenant Schwartz was designated as counsel to the board. He acted in that capacity and subsequently wrote, for the convening authority, a memorandum regarding the legal aspects of the evidence presented to the board. Thereafter, he was named in the appointing order of the officer exercising general court-martial authority, as assistant trial counsel to the court before which the accused was tried.

In order to fully understand the extent of Lieutenant Schwartz' participation in the instant case, prior to trial, the following activities of the Lieutenant are set forth:

(1) He prepared the list of questions utilized by Captain Beckner in questioning Corporal Solis.

(2) He directed Captain Beckner to have a ballistics test made on the weapon involved in the incident.

(3) He propounded, by letter, a series of questions for the coroner based upon the autopsy conducted on the body of Corporal Solis. His letter and the written reply were

utilized by and made a part of the record of the board of investigation.

(4) He obtained an affidavit, for the board's use, from the Catholic priest who administered the last rites to Corporal Solis.

(5) As counsel to the board, he necessarily was extremely active in questioning witnesses and gathering evidence.

(6) Subsequent to the completion of the board's proceedings, wherein a recommendation that the accused *only* be awarded disciplinary action for failure to obey a lawful order, he wrote a memorandum of law disagreeing with this recommendation. In his memorandum, he suggested that in addition to the order offense, three additional offenses were suggested by the evidence: involuntary manslaughter, negligent homicide, and careless discharge of firearms.

(7) He dictated, for the Commanding Officer's signature, a first endorsement to the report of the board in which the majority of its opinions and recommendations were disapproved. He also prepared, for signature, a memorandum to the officer exercising general court-martial authority, recommending that the accused be tried by general court-martial for violation of Articles 92 and 119, Code, supra. This latter communication was forwarded through the Commanding Officer of the Lake Mead Base, who appended his concurrence in the recommendation.

(8) Lieutenant Schwartz was the officer before whom the charges were sworn and he personally served them on the accused.

My brothers contend that in all of this, Lieutenant Schwartz was simply fulfilling his responsibilities as Base Judge Advocate and counsel to the board of inquiry and that his activities were entirely consistent with those roles.

I do not disagree with that view—it is eminently correct. The plain fact of the matter, however, is that Lieutenant Schwartz, having so acted, was thereafter disqualified from acting as assistant trial counsel in this case by virtue of a specific enactment of the Congress.

Article 27(a), Uniform Code of Military Justice, 10 USC § 827, provides:

"For each general and special court-martial the authority convening the court shall detail trial counsel and defense counsel, and such assistants as he considers appropriate. No person who has acted as *investigating officer,* law officer, or court member *in any case may act later as* trial counsel, *assistant trial counsel,* or, unless expressly requested by the accused, as defense counsel or assistant defense counsel in the same case. No person who has acted for the prosecution may act later in the same case for the defense, nor may any person who has acted for the defense act later in the same case for the prosecution." [Emphasis supplied.]

The Manual for Courts-Martial, United States, 1951, paragraph 64, defines an investigating officer as:

"Within the meaning of the fifth clause of 62*f* and Articles 25*d*(2), 26*a,* and 27*a,* the term 'investigating officer,' as applied to a particular offense, shall be understood to include a person who, under the provisions of 34 and Article 32, has investigated that offense or a closely related offense alleged to have been committed by the accused. *The term also includes any other person who, as counsel for,* or a member of, *a count of inquiry,* or as an investigating officer or otherwise, *has conducted a personal investigation of a general matter involving the particular offense;* however, it does not include a person who, in the performance of his duties as counsel, has conducted an investigation of a particular offense or a closely related offense with a view to prosecuting or defending it before a court-martial." [Emphasis supplied.]

Congress has decreed that anyone who has acted as an *investigating of-*

*ficer* may not, thereafter, in the same case, act as *assistant trial counsel.* The military, themselves, are agreed that an *investigating officer* is one who has acted as *counsel for a court of inquiry.* The pretrial role and activities of Lieutenant Schwartz precisely fits this definition and he is statutorily disqualified thereby. Article 27(a), Code, and paragraph 64, Manual, both supra.

The cases cited by my brothers, United States v Young, 13 USCMA 134, 32 CMR 134, and the board of review, United States v Hayes, 7 USCMA 477, 22 CMR 267, to sustain the Lieutenant's participation in the trial, are not in point.

In *Hayes* there were two questions involved: one concerned the propriety of the appointment of a military defense counsel by the staff judge advocate, who also acted as trial counsel; and the other question was whether trial counsel was disqualified from prosecuting the case inasmuch as he had previously acted as legal advisor to the investigating officer. This Court concluded that: (1) since that accused was represented at trial by a civilian lawyer, who assumed the burden of the defense, and there being nothing in the relationship between the civilian lawyer and the staff judge advocate that fettered the former in the exercise of his duties, there was no reasonable basis for concluding that the accused was prejudiced by the appointment of the military defense counsel by the same person who ultimately represented the Government in the trial of the case; and (2) there was not such incompatibility between the mere role of *legal advisor* to the investigating officer and the duties of a trial counsel, as to make the latter ineligible, *for that reason alone,* to serve in that capacity.

In *Young,* this Court again considered the role of trial counsel as regards his pretrial activity as legal advisor to the investigating officer. The majority held the trial counsel not disqualified under Article 27(a), Code, supra, on the ground that the record reflected he only *advised* on legal matters and did not, by reason of his activities, supersede the investigating officer in the exercise of his duties or himself become an associate investigating officer. I dissented to that holding because, as I viewed the evidence, the trial counsel, after his appointment as counsel to the investigating officer, served as such, advised that officer with respect to rulings and legal matters, and acted in every way as though he were a law officer presiding in an adversary proceeding. I found no difference between his role in that case and that of counsel for a court of inquiry, which latter activity operates as a statutory disqualification from later participation as trial counsel. See also United States v Bound, 1 USCMA 224, 2 CMR 130, and United States v Lee, 1 USCMA 212, 2 CMR 118, for a further exposition on what constitutes an investigator within the meaning of the Code. As I said in *Young,* when "we permit the prosecutor to sit on the bench with the pretrial investigating officer . . . [we] open the door for the ultimate elimination of the impartial pretrial screening of charges and discovery of evidence which the Congress envisioned." *Ibid.,* at page 144.

Since I believe (1) that the law officer erred by failing *sua sponte* to instruct the court on the weight and credibility to be accorded the dying declaration, and (2) that Lieutenant Schwartz was statutorily disqualified from serving as assistant trial counsel, I would reverse the decision of the board of review and order a rehearing.